McClendon, j.
12This is a proceeding to involuntarily terminate parental rights. The lower court terminated the parental rights of the mother, but did not terminate the parental rights of the father. For the reasons that follow, we affirm in part, reverse in part, and render.
*1154 FACTUAL AND PROCEDURAL HISTORY
On June 1, 2007, the State of Louisiana, Department of Social Services, Office of Community Services (OCS) filed a Petition for Certification for Adoption and Termination of Parental Rights regarding three minor children, T.R., W.R., Jr., and P.R.[1] The mother of the children, L.W., is hospitalized at the Eastern Louisiana Mental Health System, known as the Feliciana Forensic Facility, in Jackson, and the father, W.R., last resided in St. Francisville. In its petition, OCS alleged that the children first entered foster care on February 24, 2005, due to neglect by their father. The trailer in which they were living was in deplorable condition, and they were threatened with eviction. The father refused to move his family to a shelter because he could not take his dogs. The petition further alleges that the children were returned to their father’s custody on May 17, 2005, pursuant to an Informal Adjustment Agreement. The children were returned to foster care on August 16, 2005, after the father was arrested for simple battery on T.R. outside the child’s school. They have remained in the state’s custody since that time. On November 28, 2005, the children were adjudicated children in need of care.
With regard to the mother, OCS alleged that L.W. was arrested for attempted murder in 2000 and, as a result, she was involuntarily committed for an indefinite time to the Feliciana Forensic Facility. L.W. remains committed without a release date. Thus, according to OCS, L.W. is unable to care for her children. OCS further asserted that L.W. understands that she cannot presently care for her children and would like them to remain in foster care. However, |aOCS contends that this is not an acceptable permanent plan. Further, OCS asserted that because of her confinement, L.W. has not substantially complied with her case plan, and it is unlikely that there will be significant improvement in L.W.’s condition in the near future.
As to the father, OCS sought termination of W.R’s parental rights, asserting that he has not substantially complied with the case plans over the course of the case. Specifically, OCS alleged:
1. [W.R.] was ordered to obtain and demonstrate that he maintain safe and stable housing. He was incarcerated from July 2006 until December 2006. He was arrested for cocaine possession. Prior to his arrest he was living rent-free in a friend’s storage trailer. Since being released from prison, he has been residing with his mother and this was intended as temporary. [W.R.] has failed to obtain and demonstrate that he can maintain safe and stable housing suitable for his children.
2. [W-R-] was ordered to obtain and maintain stable employment. He now states he is employed but has been unemployed more than he has worked. [W.R.] did not pay the requested $100 child support. In fact, it was learned [W.R.] had continued to receive [W.R., Jr.’s] social security check of $600 per month although [W.R., Jr.] was in the custody of OCS. [W.R.] could have contributed those funds towards the costs of care but he did not.
3. [W-R-] was ordered to remain drug free. On June 8, 2006, he tested positive at court on his drug screen. He was arrested for cocaine posses *1155 sion in August 2006. [W.R.] failed to schedule a substance abuse evaluation before his arrest. [W.R.] reports keeping two appointments at Capita! Area Center for Addictive Disorders. The case manager was ordered to receive the reports. [W.R.] stopped attending the classes when he started work. [W.R.] has yet to demonstrate that he has remained drug and alcohol free.
4. [W.R.] did participate in a psychological evaluation with Dr. Toldano who recommended: “completion of parenting classes and progress in therapy should be ascertained before consideration is given to returning his children to his care.” [W.R.] attended only 1 of 3 sessions at Family Roads for parenting. He only made 7 of 15 sessions of parenting classes held at Discovery. [W.R.] has not completed therapy. Most recently, [W.R.] has engaged in parenting classes/anger management at Discovery.
5. [W.R.] has not been consistent in exercising visitation with [P.R.] and [W.R., Jr.] His visits with [T.R.] were suspended by the Court on the recommendation of her therapist. Most recently, since the Court set the goal as adoption, [W.R.] has been more deliberate in his visits.
6. [W.R.] has not fully complied with his case plan. There is no reasonable expectation of improvement in his compliance in the |4near future. Based upon his history of substance abuse and incarcerations, the likelihood of reformation is minimal.
The adjudication hearing for the termination of the parental rights of L.W. and W.R. was held on September 24 and 25, 2007. Oral reasons were rendered on October 30, 2007, terminating the parental rights of L.W., but dismissing the petition as to the father, W.R. Judgment was signed in accordance with the ruling on December 7, 2007. OCS and L.W. each appealed.
On appeal, OCS contends that the trial court erred in finding that it had not proven by clear and convincing evidence the grounds for termination of W.R.’s parental rights. In her appeal, L.W. asserts that the trial court erred in finding that OCS had proven by clear and convincing evidence that the grounds for the termination of her parental rights were met.
APPLICABLE LAW
An appellate court reviews a trial court’s findings as to whether parental rights should be terminated according to the manifest error standard. State ex rel D.L.R., 08-1541, p. 11 (La.12/12/08), 998 So.2d 681, 687. The Louisiana Supreme Court has repeatedly expressed its concerns regarding the involuntary termination of parental rights:
In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consis *1156 tently found the interest of the child to be paramount over that of the parent.
The State’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and ^responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. (Citations omitted.)
State in the Interest of J.A., 99-2905, pp. 7-9 (La.1/12/00), 752 So.2d 806, 810-11. See also State ex rel D.L.R., 08-1541 at p. 11, 998 So.2d at 687-88; State ex rel. K.G., 02-2886, pp. 4-5 (La.3/18/08), 841 So.2d 759, 762-63; State ex rel. C.J.K., 00-2375, pp. 7-8 (La.11/28/00), 774 So.2d 107, 113.
Title X of the Children’s Code governs the involuntary termination of parental rights. Article 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. The state need establish only one ground, but the court must also find that the termination is in the best interest of the child. Additionally, the state must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. State in the Interest of J.A., 99-2905 at p. 9, 752 So.2d at 811.
Thus, a court considering a petition to terminate parental rights must make two findings: (1) that OCS established one of the enumerated grounds for termination set forth in LSA-Ch.C. art. 1015 by clear and convincing evidence, and (2) that termination is in the best interest of the child. State ex rel D.L.R., 08-1541 at p. 12, 998 So.2d at 688.
Pertinent to this matter is LSA-Ch.C. art. 1015(5), which provides:
The grounds for termination of parental rights are:
[[Image here]]
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for | sthe safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
Children’s Code article 1036 C provides:
C. Under Article 1015(5), lack of parental compliance with a case plan may *1157 be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the ease plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
Additionally, LSA-Ch.C. art. 1086 D provides:
Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3)Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
17Termination of W.R, ⅛ Parental Rights
In this appeal, OCS contends that it proved by clear and convincing evidence each and every element required by LSA-Ch.C. art. 1015(5) as to W.R. and that the trial court manifestly erred in its conclusions.
It is undisputed that the children have been in the state’s custody since August 16, 2005, a period of more than two years at the time of trial, and thus clearly for more than a year as required by LSA-Ch.C. art. 1015(5).
Numerous case plans were approved over the course of this matter. The case plans set forth the issues that W.R. needed to address: 1) housing, 2) employment, 3) parenting, 4) visits, and 5) substance abuse. OCS argues that there was no evidentiary support for the trial court’s conclusion that W.R. substantially complied with the case plans and that the court failed to recognize the overwhelming testimony and evidence presented that W.R. did not substantially comply. Thus, according to OCS, the trial court was clearly wrong. OCS also maintains that the trial court manifestly erred in concluding that OCS did not meet its burden of proof with regard to the third prong, as the evidence clearly showed that there was no reasonable expectation of significant improvement in W.R.’s conduct in the near future.
To establish W.R.’s failure to substantially comply with the case plans and to establish the lack of any reasonable expec *1158 tation of significant improvement in his conduct, OCS offered the testimony of several witnesses. Linda Singleton, an OCS child investigator, first testified. She stated that in February 2005 she received a report alleging inadequate shelter regarding W.R.’s home. Upon investigation, Ms. Singleton stated that the home was in deplorable condition. W.R., however, was cooperative and answered all questions. The final findings were inadequate shelter and inadequate food. W.R. initially agreed to participate in all family services requested by OCS, but later became irate and declined any services. Ms. Singleton testified that based on his failure to voluntarily participate, she requested and received a verbal hold order. The children were taken into state custody on February 24, 2005.
|RBetty Wright, an OCS case manager, testified that she was assigned the case on February 24, 2005. She testified that initially she was not sure where W.R. was living, as he would not give her an address, but she later determined that he moved into a family friend’s home in Baton Rouge. W.R. was told to look for housing and employment. He made “sketchy progress” as he was living with a friend and had no stable employment. On May 17, 2005, OCS and W.R. entered into an informal adjustment agreement and the children were returned to his care. The conditions of the agreement were that W.R. would be employed within thirty days; W.R. would find a residence within sixty to ninety days; OCS would provide daycare assistance upon W.R.’s employment; W.R. would take the children to a doctor for examination and provide proof of such; the parents would cooperate with OCS; W.R. and the children would continue to reside at the Baton Rouge address, unless prior notice was given to OCS; and W.R. would comply with visitation by the children with the mother. Ms. Wright testified that W.R. complied with some of the conditions. He was not able to find stable employment, but he found housing. Ms. Wright’s involvement with the case ended on June 23, 2005.
Joseph Price, an OCS investigator, testified that he investigated an August 15, 2005 report of physical abuse by W.R. upon T.R. in front of her school. W.R. said he did not hit T.R. Mr. Price testified that the report was validated for the abuse and there was also a finding of neglect because of the condition of the trailer that they were living in. He stated it was not a safe environment for the children. W.R. was arrested and the children were taken into state custody and subsequently adjudicated to be children in need of care.
Henrietta Esedo, a former case manager at OCS, testified that she was assigned the case in August 2005. W.R. was incarcerated, and L.W. was confined in the Feliciana Forensic Facility. On September 9, 2005, an initial family team conference was held and a six-month case plan developed. W.R. was to obtain a safe and stable home, obtain stable employment, maintain contact with the children, learn parenting skills, participate in a psychological | ^valuation, have a substance abuse evaluation, and maintain contact with OCS. Ms. Esedo testified that in reference to W.R., she arranged for psychological testing with Dr. Toldson, arranged for parenting classes, and provided him information regarding housing and employment. She also testified that she gave him bus tokens and money. She stated that it was hard to make contact with him although he gave her an address. At some point, he gave her a phone number where she could leave a message. Ms. Esedo also had a problem with W.R. complying with the substance abuse evaluation requirement. W.R. missed some of the parenting skills classes and some visitations with the children, and he did not comply with the job search *1159 requirement. Ms. Esedo testified that W.R. always had excuses and stated he was doing the best he could.
A family team conference was held in February 2006, but W.R. was not present as he was incarcerated. The new case plan had additional requirements for W.R., including providing documentation of his job search to include contact persons and telephone numbers and addresses. It also provided that he was to maintain contact with the case manager. Ms. Esedo stated she had difficulty contacting him and was the one “chasing him everywhere to try to meet with him.” She testified that it was “a battle” trying to get him to do what he needed to do. Ms. Esedo also stated that there was no move to get a safe and stable home by W.R., even with his employment.
As far as compliance with the February 2006 ease plan, Ms. Esedo testified that W.R. missed eight of the fifteen scheduled parenting classes and missed four of sixteen visits with the children. She stated he had yet to supply documentation regarding his job search, nor had he complied with maintaining contact with her. Additionally, he did not follow through with a substance abuse evaluation. Ms. Esedo testified that W.R. was in court for a hearing on June 8, 2006, and a drug test was ordered by the court. After the test came back positive, W.R. told the court that he had already arranged for substance abuse treatment. At a later date, W.R. told her he did not follow through because he did not need it.
|inMs. Esedo left OCS in September 2006, at which time it was OCS’s recommendation that adoption as a permanent plan was in the best interests of the children.
Janice Coleman is an OCS child welfare specialist who was assigned the case from September 2006 until January 2007. She testified that W.R. was incarcerated for possession of cocaine when she took over the case. The July 24, 2006 case plan by Ms. Esedo was in effect at that time.[2] Ms. Coleman testified that W.R. made very little progress with the case plan primarily because he was incarcerated and not released until December 2006. At that time, he contacted her to arrange a visit with his children and he started to try to comply with the plan. W.R. gave Ms. Coleman his mother’s address as his place of residence. She stated they went over the case plan and the things required of W.R. Ms. Coleman testified that W.R. did start to visit his children and attended some parenting classes. She was told by W.R. that he found a job, but he never supplied documentation to verify that he was employed. Ms. Coleman also testified that W.R., Jr. received a $600 per month social security check that would normally go to the state since he was in the state’s custody; however, through a mix-up, W.R. continued to receive it for more than a year. At that time W.R. was living in an abandoned trailer and she did not know what- he did with the money. Also, as far as Ms. Coleman knew, W.R. never underwent a substance abuse assessment as he said he would. In Ms. Coleman’s opinion, the most significant issues were W.R.’s lack of a stable place to live, stable employment, and substance abuse treatment.
Alba Melton-Brown was the OCS foster care worker assigned to this case in March 2007. A family team conference was held on July 26, 2007, and W.R. was not present. The case plan developed at that time *1160 was similar to the last one, with the exception that W.R. had completed parenting classes. At the |nfamily visit on September 18, 2007, W.R. reported that he was living at an address on East Mason Street in Baton Rouge. When Ms. Melton-Brown went by the house, being unable to reach W.R. by telephone, the individuals sitting on the porch did not know W.R. by either name he used. In her opinion, the home did not look to be appropriate housing for his children. Ms. Melton-Brown testified that she made contacts regarding low-income housing for W.R., but because of his criminal record she could not find anything for him. Also, W.R.’s mail was being returned from the St. Francisville address even though he said he lived there. Ms. Melton-Brown also testified that on one occasion she asked W.R. about doing a home study at his mother’s house, but his mother’s home was never offered as a possible placement. When Ms. Melton-Brown called his mother’s home, most of the time his mother answered, but W.R. was never there. Ms. Melton-Brown continued to ask for a telephone number where W.R. could be reached. W.R. gave her two different numbers. One number was disconnected and no one knew W.R. at the other number. Ms. Melton-Brown testified that W.R. never asked her for assistance for housing and that she never could actually locate where he was living. She stated that W.R. still had not met the goal of obtaining housing for his children.
W.R. told Ms, Melton-Brown that he was working and she asked him for verification of his employment. W.R. stated he would bring her verification but he never did. In her opinion, he had not achieved the goal of employment. Ms. Melton-Brown believed, however, that he had substantially complied with the case plan with regard to the visits with his children. With her help in locating a center, W.R. underwent a substance abuse assessment on May 4, 2007. He did not follow through with the recommended services. He was discharged from the program due to lack of attendance. When Ms. Melton-Brown asked W.R. about the discharge, he stated that “he was really stressed out” and “going through a lot.”
Ms. Melton-Brown summarized that in reviewing the case plan, W.R. still had shown no documentation of employment or income, no documentation of |12safe and adequate housing, and no documentation of the completion of a substance abuse program. OCS’s recommendation was for adoption as “there has not been any significant change in progress.”
Dr. Ivory Toldson, an expert in counseling psychology, testified that he assessed W.R. on October 27, 2005, after W.R. was referred to him by OCS. Dr. Toldson testified that W.R. was cooperative in answering his questions, but he was not able to assume any personal responsibility for his circumstances, feeling that he was a victim of wrongful persecution. W.R. reported a desire to father his children and have them in his care. W.R. was aware that his living conditions and capacity to provide revenue for the family were deficient. W.R. wanted OCS to do more to help in those regards. Dr. Toldson stated that he was concerned that W.R.’s initiative in those regards was less than what was expected of an adult male who wished to father his children. He stated that “while the desire seemed to have been there, ... the effort was more one of seeking help rather than real pro-active looking and searching for ways to remedy his inadequate circumstances to make ... better provisions for the children.” Dr. Toldson stated that from a mental health standpoint, however, that was not considered a mental disorder. What he saw “were lots of feelings of persecution and a lot of blaming externally for his circumstance and ... certainly a failure to assume any ownership of any *1161 problems that he found himself with.” At that time, Dr. Toldson believed that if W.R. could have secured gainful employment and a decent place to live, coupled with his seemingly sincere desire to care for his children, the children could be returned to his care. Substance abuse was not. an issue the first time W.R. was interviewed.
Dr. Toldson saw W.R. again on April 5, 2006, when he was asked by OCS to see W.R. and his children together in order to give a more definitive opinion about W.R.’s ability to assume custody of his children. Dr. Toldson testified that there was no change. The children were encouraged to express their feelings about returning to their father’s care. The two younger children “were certainly favorable towards that prospect.” The oldest child was adamantly opposed, 11 sh owe ver, and that created a little bit of discord because W.R. “felt that she had been negatively influenced by the foster parents.” Dr. Toldson stated that W.R. was defensive and verbally aggressive towards T.R. Dr. Toldson also reported however that W.R. did exhibit positive parenting responses to W.R., Jr., who was having the most difficulty in adjusting. W.R’s responses to him were appropriate and demonstrated an ability to exhibit positive parenting responses. Because W.R.’s circumstances had not changed, reunification was still not possible and continued family therapy was recommended. When asked what his prognosis for W.R. would be if he was told that W.R. still had no stable employment or housing at the time of trial, Dr. Toldson responded that it would certainly reduce the level of optimism for a positive conclusion.
Celia Mallad, a licensed social worker and an expert in the field of clinical social work, testified that OCS referred the case to her because of issues with T.R. T.R. was unwilling to see her father, and those visits were suspended. She saw all the children and W.R. Her initial observations were that W.R. had a great interest in his children and the younger two children interacted with him in a positive way. W.R. indicated to her that he was wrongly accused of hitting T.R. During her first contact with W.R. on May 15, 2007, he “was very cooperative with everyone involved and appeared to be meeting expectations.” Ms. Mallad’s last contact with W.R. was on June 19, 2007. He had finished parenting classes, told her that he was working, but what stood out to her was that he had not yet secured adequate housing. In that last session, W.R. also asked her for some money for gas. By the time of the last visit, Ms. Mallad had some concern because she understood that W.R. was missing family and substance abuse meetings. She believed that W.R. was “perfectly capable” of getting “back on track” for his children “if he really wants to do that.” She also stated that the children seemed to be doing well in foster care.
W.R. testified on his behalf. He testified that he was currently doing temporary work. W.R. testified that beginning in 2005, he worked at Georgia Pacific doing contract work and then for Turner building scaffolds. He stated he 114gave a copy of his check stubs to Ms. Esedo and also to Ms. Brown. He said he also gave a copy of a check stub to the court in February 2007. W.R. stated he was laid off from Turner because his car broke down. He next worked for G.M. Cable out of Central. After G.M. Cable, W.R. testified that he was doing temporary home-repair work for the Browns, friends he met through church. When discussing the incident with T.R., he denied punching her, but said he was arrested the next day and spent about fifteen days in jail. W.R. testified that he was also incarcerated in June 2006 for about six months on a charge of pos *1162 session of cocaine. He stated that the case was dismissed. With regard to substance abuse treatment, W.R. stated that Ms. Brown did not give him any information until a few weeks before trial. He stated he did attend some drug treatment until his car broke down. W.R. stated that OCS has done nothing to assist him in finding housing. He testified that he received one list in 2006, but it was for senior citizens. W.R. further stated that he has talked to OCS from the beginning about finding him housing and that it has been his number one priority. W.R. stated he visits his children twice a month and has taken off work to do so. On two or three occasions the children were not present for the visit.
On cross-examination, when asked where his children would stay if they were immediately returned to him, W.R. stated that the only place he could take them would be to his mother’s home. He stated he lives in St. Francisvilie, but sometimes stays at the trailer on East Mason Street. He stated it was not a drug house, and when asked if it was in a drug area, he answered by asking, “what place in Baton Rouge ... is not a drug area.” W.R. testified that he used to use cocaine because he was stressed but no longer uses it. On cross-examination, W.R. was asked why he did not have a place to live. W.R. responded that “he had a lot of bills to pay” to stay out of jail. Also, he stated that his car broke down and he could not get to scheduled substance abuse treatment appointments. Ms. Mallad had recommended that W.R. participate in a substance abuse program for six consecutive months on a weekly basis. He told her he would do whatever it took to get his children back. When asked if he |1Bcomplied, W.R. stated he did what he could, but admitted that he has not enrolled in any substance abuse since the recommendation was made in July 2007. With regard to foster care, W.R. stated that “fa]ll this is being perpetrated and all of this is a lie because from the beginning, they said I had punched my daughter in the mouth; okay, there’s no proof of me punching my daughter.”
Regarding why his children were first placed in custody in February 2005, W.R. stated:
There was a problem that occurred. Okay, I whipped my daughter, okay, she was running, she fell over a bed, okay and bruised her leg, okay, so I was talking to an OCS worker and ... I was asking her for help with my children, okay, so my children were at school, okay, so I told her that if I couldn’t get no help from OCS, I was going to take my kids and go back to California. Okay, so by the time I went to the school to get my kids, OCS had ... took my kids already. [There] was no problem for them taking my kids from the beginning. There was no problem for them taking my kids the second time.
Also, he stated the house was not in a deplorable condition. After W.R. was evicted from his house and Volunteers of America offered the family shelter, W.R. declined. He explained:
Why I wouldn’t go was because that I had two animals, two dogs, which was the kids pets, and the kids loved the pets, ... so I wasn’t going to take that from my kids, okay so me, I’m the type of father like this. I provide whatever type of love I can for my kids, okay.
He also explained that the reason he was evicted was because there were holes in the floor and the landlord would not fix the problem. That’s why it was deplorable. W.R. also testified that he used W.R., Jr.’s SSI checks to continue to support his children with clothes, VCRs, Play Stations, and bicycles. He gave them money. He testified that the majority of the money went towards the children. When asked why he did not take the $600 per month to *1163 rent a house, W.R. stated that he did not do that because at the time, he “was trying to accommodate them.” When explaining his different addresses, W.R. stated that sometimes he stayed in Baton Rouge because of work. He then said that the address on East Mason he gave to OCS was not where he was living, but that he was living down the street. Also the telephone numbers he gave to OCS were contact numbers since the trailer down the street did not have a phone.
hfiThe trial court gave its oral ruling on October 30, 2007. With regard to W.R., the court concluded:
Although [W.R.] did not fully comply in every area, one hundred percent, he did make significant efforts and [strides] in all the areas mentioned, such as housing, employment, parenting classes; therefore the second prong of 1015.5 has not been met.... Furthermore, since [W.R.] did make numerous efforts to comply with the case plan, there exists a reasonable expectation of some significant improvement.... Therefore, the third prong of 1015.5 has not been happening. ... In the present case, [W.R.] has made substantial compliance with his case plan. Testimony revealed that [W.R.] has been persistent in applying for obtaining services necessary to place him in a position to regain custody of his children.... Thus, as it relates to [W.R.], I find that the state has not met [its] burden of proof by clear and convincing evidence to terminate [W.R.’s] parental rights.
We disagree with the trial court that W.R. had made “significant efforts” and had been “persistent in applying for obtaining services necessary to place him in a position to regain custody of his children.” Although the trial court mentioned some compliance with the case plans, this is clearly outweighed by the noncompliance and lack of improvement in the problem areas that caused removal and prevented reunification. The case plans addressed the myriad of problems that needed to be remedied before the children could be returned home, especially the problems with stable housing, stable and verified employment, and substance abuse treatment. These concerns have not been adequately addressed and complied with by W.R. While some improvements may have been made in some areas, such as parenting classes and visitation, significant problems remain. Further, OCS has tried to assist W.R. throughout this process, but the same concerns remain. The conditions that led to the removal of the children persist, despite the passage of more than two years.[3]
Based on the foregoing and after thorough review of the record, we find manifest error in the trial court’s conclusion that OCS did not present clear and convincing evidence of grounds for the termination of W.R.’s parental rights. We determine that the trial court manifestly erred in finding that there was substantial parental compliance by W.R. with the case plans. Further, W.R.’s | ^established pattern of behavior evinces a lack of any reasonable expectation of significant improvement in W.R.’s conduct in the near future. W.R. has shown no substantial improvement for more than two years in redressing the problems that prevent reunification with his children. Thus, based on our review of the record, we also find manifest error in the trial court’s determination that OCS had not met its burden of proof, by clear and convincing evidence, that there was a lack of any reasonable expectation of significant improvement in W.R.’s conduct in the near future.
*1164 We conclude that the record shows that OCS has sufficiently established one of the enumerated grounds set forth in LSA-Ch.C. art. 1015 for the termination of W.R.’s parental rights. We also conclude that said termination is in the best interests of the children. The children have been in the custody of OCS since August 2005. The testimony established that they are doing well with their current foster families. W.R. states that he loves his children and surely he does. However, his interests are not the standard by which this case must be resolved. The best interests of the children must control the outcome. Moreover, OCS has attempted to work with W.R. for over two years and, as one OCS worker put it, it was always “a battle.” There simply has been little improvement and nothing to evidence any likelihood for improvement. Termination of W.R.’s parental rights is in the best interest of the children.
Termination of L.W. ⅛ Parental Rights
With regard to the mother, Dr. Jason Thomas, a staff psychiatrist at Felicia-na Forensic Facility and an expert in forensic psychiatry, testified that L.W. was admitted to the hospital in December 2002 and that she has continuously remained there since that time. He stated that L.W. was found not guilty by reason of insanity to a charge of aggravated battery in August 2003. Dr. Thomas testified that he sees L.W. at least one a month and that L.W. has been diagnosed with schizoaffec-tive disorder. She is currently on multiple medications. The latest court review of judicial commitment prepared by Dr. Thomas in August 2007 indicated that L.W.’s treatment response had recently | isbeen poor. Dr. Thomas testified to a history of violence, paranoia, and noncompliance with medication. He stated that he was concerned about her current mental status. L.W. was also transferred to a more restrictive unit in June 2007. He further reported that L.W. has limited to poor insight regarding her illness and past actions.
When asked if L.W. could care for her children, Dr. Thomas responded that although he did not assess her in that role, he believed that she was impaired because of her mental illness. Dr. Thomas did find some positives, stating that L.W. currently was taking her medication, recently went on an excursion, and was working as a housekeeper on the unit. Although Dr. Thomas conceded that it was possible that L.W. could be released and go home in less than a year, he also believed that would be very difficult, given her history and current mental state.
The trial court determined that L.W. has been unable to comply with her case plans because of her commitment. The court further found that L.W. had been unable to care for her children for the past seven years and that the testimony at trial indicated that there was no expectation of significant improvement. The court concluded that OCS had met its burden of proof under LSA-Ch.C. art. 1015 and additionally that it was in the best interests of the children to terminate the parental rights of L.W. Based upon our thorough review of the record, we cannot say that the court was clearly wrong in its factual findings as to L.W.
CONCLUSION
Based on the facts and evidence presented, we conclude that it is in the best interests of the children to terminate the parental rights of W.R. and L.W. Accordingly, we reverse that portion of the trial court judgment dismissing OCS’s petition to terminate the parental rights of W.R. In all other respects, including the termination of the parental rights of L.W., the judgment is affirmed. Judgment is rendered totally and irrevocably terminating the parental rights of W.R. and certifying *1165 the children, T.R., W.R., Jr., and P.R., free and eligible for |inadoption. See LSA-Ch.C. art. 1037 F. Costs of this appeal are assessed one-half to W.R. and one-half to L.W.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.
DOWNING, J. concurs and assigns reasons.

. T.R. was born on September 16, 1995, W.R., Jr. was born on December 5, 1997, and P.R. was born on August 16, 1999.

. The July 24, 2006 case plan was approved by the trial court at a permanency hearing held on August 28, 2006. The trial court also determined that the permanent plan that was the most appropriate and in the best interest of the children was adoption. The court further ordered OCS to file a petition for termination of parental rights.

. The children first entered foster care on February 24, 2005. The Petition for Certification for Adoption and Termination of Parental Rights was filed on June 1, 2007.